## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 02 2015, 10:20 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Miller
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.L.,

T.L. (Mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

June 2, 2015

Court of Appeals Case No.
49A02-1410-JT-732

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge and the Honorable Larry E. Bradley, Magistrate

Trial Court Cause No.
49D09-1403-JT-126

**Mathias, Judge.**

[1] The Marion Superior Court terminated T.L.'s ("Mother") parental rights to her minor child, J.L. Mother appeals and argues that the trial court's finding that a reasonable probability exists that continuation of Mother's parent-child relationship poses a threat to J.L.'s wellbeing was not supported by sufficient evidence.

[2] We affirm.

## Facts and Procedural History

[3] On April 25, 2013, the Department of Child Services ("the DCS") filed its third petition alleging that ten-year-old J.L. was a child in need of services ("CHINS"). The DCS alleged that Mother was not providing J.L. with a safe, sanitary, and stable living environment free from physical abuse.

> [Mother] has a history with the DCS which includes a prior [CHINS] action and a current open Informal Adjustment [IA]. Despite the DCS' involvement, [Mother] continues to demonstrate the instability to provide the child with a safe, appropriate home. [Mother's] home was observed to be in very poor condition, and she failed to make adequate improvements despite the opportunity to do so. In addition, she was recently evicted from the residence, and the family lacks stable housing. [Mother] has also caused physical harm to the child. She struck [J.L.] in the face repeatedly which resulted in significant bruising to his face.

Ex. Vol., Petitioner's Ex. 30, p. 78.

[4] Mother's prior history with DCS includes a CHINS petition filed in 2005 because J.L.'s home was not safe and sanitary. Mother participated in services, and the CHINS action was closed. In November 2012, the DCS filed a second

CHINS petition alleging that J.L. had been sexually abused by Mother's boyfriend and that the home was unsanitary. Mother's boyfriend was convicted of molesting J.L. and is incarcerated. Because Mother complied with services offered to help her to maintain a clean home, the case was converted to an Informal Adjustment in March 2013. However, J.L. was removed from Mother's care after the Informal Adjustment failed, and the April 25, 2013, CHINS petition was filed.

J.L., who is on the autism spectrum, specifically with an Asperger's diagnosis, attends a school for high ability students. While in Mother's care, he would often arrive at school with dirty clothing, unbrushed teeth, body odor, and unclean hair and nails. J.L. was a social outcast as a result of his poor hygiene. Teachers and counselors from J.L.'s school spoke to Mother on more than one occasion about J.L.'s hygiene issues. J.L.'s hygiene problems would temporarily improve, but the problems would reoccur. Mother also has problems with her own hygiene.

J.L. struggled to complete his schoolwork and was not working to his maximum ability. J.L.'s teachers felt that he seemed defeated, sad, and had "checked out." J.L. often spent recess by himself. J.L. also suffers from anxiety.

Mother's former boyfriend, who lived with Mother and J.L., had prior convictions for battery, rape, and attempted murder. Mother was aware of

boyfriend's criminal history. Initially, Mother did not believe J.L. when J.L. told her that her boyfriend had molested him. Also, when J.L. was in the third grade, two neighborhood children performed sexual acts on J.L. After J.L. told Mother what had happened, she did not allow J.L. to play with the children. However, after an undisclosed period of time had passed, Mother began to encourage J.L. to play with the children at their home.

[8]     Mother physically abused J.L. She slapped him, hit him in the face, and pulled his hair. Mother admitted to physically abusing J.L. but tried to excuse her behavior by stating that she was completely stressed out and overwhelmed. Mother also would bite and lick J.L.'s ears. She also made ten-year-old J.L. sit on her lap during a meeting at his school.

[9]     Mother cannot maintain stable employment due in part to her hygiene issues. Also, she and J.L. lived in nine different residences in five years and were homeless on at least three occasions.

[10]    Both Mother and J.L. participated in therapy during the CHINS proceedings. As a result of therapy and DCS-provided services, Mother has improved the cleanliness of her home and some of her hygiene issues. However, she has not accepted responsibility for the trauma she caused to her child. Mother will not apologize for her past behaviors and makes excuses for her behavior and J.L.'s hygiene issues. For example, she blamed the filth of their home in part on J.L.'s

refusal to do his chores. J.L. is scared to return to Mother's care and believes that Mother cannot maintain the positive changes that she has made. Mother refuses to hold herself accountable for J.L.'s fear for his safety and his inability to trust her.

[11] J.L. exhibited increased nervousness and anxiety after supervised visitation with Mother. He could not focus in school on days visitation was to occur. In February 2014, J.L. asked for visitation with Mother to be stopped. J.L. has not seen Mother since that date. They continued to have contact via email, but in July 2014, J.L. requested no further contact with Mother. Since the contact with Mother ended, J.L. has been calmer and has exhibited less anxiety. He is also more focused in school and vocal about his feelings.

[12] J.L. has been placed with his foster family since September 2013, and the family desires to adopt him. J.L. has improved significantly during his placement with his current foster family. J.L. used to eat with his fingers, failed to shower, brush his teeth, and struggled to clean himself after using the toilet when he was first placed with his current foster family. He also slept where he found a spot and not in a bed. Also, J.L. was on nine different medications.

[13] By the summer of 2014, J.L.'s peer relationships, hygiene, and appearance had improved. His academic performance is greatly improved, and he is more

confident. His medications have been reduced from nine to two. J.L. wants to be adopted by his foster family and is afraid to be returned to Mother's care.

[14] J.L.'s family case manager and guardian ad litem believe that termination of Mother's parental rights is in J.L.'s best interests. Both agree that Mother is unable to meet J.L.'s needs. Mother's psychologist also believes that Mother cannot provide the mental health and environmental stability that is necessary to effectively parent J.L.

[15] On March 13, 2014, the DCS filed a petition to terminate Mother's rights to J.L.,[1] and hearings were held on the petition on August 11 and 21, 2014. On September 22, 2014, the trial court issued findings of fact and conclusions of law and terminated Mother's parental rights to J.L. Mother now appeals.

## Standard of Review

[16] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine

---

[1] J.L.'s father has not been significantly involved in his life. He consented to J.L.'s adoption by J.L.'s current foster parents.

whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

## Discussion and Decision

[17] "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

[18] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

> (2) The petition must allege:
>> (B) that one (1) of the following is true:
>>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> > (C) that termination is in the best interests of the child; and
>
> > (D) that there is a satisfactory plan for the care and treatment of the child.

[19] DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id*. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[20] Mother argues that the trial court's finding that a reasonable probability exists that continuation of Mother's parent-child relationship with J.L. posed a threat to J.L.'s wellbeing was not supported by sufficient evidence.[2] Mother alleges

---

[2] Mother does not challenge the trial court's conclusion that a reasonable probability exists that the conditions that resulted in J.L.'s removal or the reasons for his placement outside Mother's home will not be remedied. The trial court concluded that the DCS met its burden of proving both subsections. Because the statute is written in the disjunctive, the DCS needed to prove only one of the requirements of subsection (b)(2)(B). *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999). Also, Mother does not challenge the trial court's conclusion that termination of her parental rights was in J.L.'s best interests. Mother therefore waived these issues on appeal. *See* Ind. App. R. 46(A)(8)(a). Given the constitutional rights at issue in termination proceedings, we will consider whether the DCS established that termination was in J.L.'s best interests.

that her rights were terminated because of J.L.'s fear of being reunited with Mother, which was unfounded because she "made improvements in her own personal hygiene and there was no danger that J.L. would not take care of his own hygiene [or] that he would be exposed to physical or sexual abuse." Appellant's Br. at 4. Mother also notes that she had a stable and clean home on the date of the termination hearing.

[21] J.L.'s fears are well founded. Mother neglected J.L.'s hygiene and physically abused him. Mother did not provide a stable, clean, and safe home for J.L. to live in. Importantly, despite therapy and services, Mother has not accepted responsibility for physically abusing J.L. or for failing to appropriately care for him. Mother makes excuses for her behavior and J.L.'s issues with hygiene.

[22] Mother does currently have a clean home, but she has not established that she is able to maintain cleanliness or stability, and she does not have a stable income. Mother's psychologist does not believe that Mother has demonstrated that she is able to provide the mental health and environmental stability necessary to parent J.L.

[23] Because he is on the autism spectrum, stability and consistency are especially important for J.L. His guardian ad litem believes that continuation of the parent-child relationship poses a threat to J.L.'s well-being because J.L. does not feel safe with Mother and Mother cannot provide the stability that J.L. needs. Tr. pp. 375-77.

[24] For all of these reasons, we conclude that the DCS presented sufficient evidence to prove a reasonable probability exists that continuation of Mother's parent-child relationship with J.L. poses a threat to his wellbeing.

[25] Finally, we consider whether termination of Mother's parental rights is in J.L's best interests. In assessing what is in the best interests of a child, courts should look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Courts also must consider a parent's fitness to care for a child at the time of the termination hearing, taking into consideration any evidence of changed conditions. *Id.* at 287.

[26] Also, parent's habitual patterns of conduct must be evaluated, including consideration of a parent's history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* "A parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." *Id.* at 290. Finally, "a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

[27] When J.L. was removed from Mother's care, he had lacked motivation in school, was a social outcast due to his poor hygiene, and suffered from anxiety

because of the lack of stability in his life. Mother has not accepted responsibility for the trauma that J.L. has suffered or her physical abuse of him.

[28] J.L. has improved significantly while in the care of his current foster family. He is doing well in school, his hygiene is improved, he is more confident, and his behavior has changed dramatically. He was taking nine medications when he was placed in foster care but is now only taking two. Both the family case manager and the guardian ad litem testified that termination of Mother's parental rights was in J.L.'s best interests. Tr. pp. 309, 375.

[29] For all of these reasons, we conclude that the DCS presented sufficient evidence to prove that termination of Mother's parental rights is in J.L.'s best interests.

[30] Therefore, the DCS proved by clear and convincing evidence the required statutory factors enumerated in Indiana Code section 31-35-2-4(b). We affirm the trial court's order terminating Mother's parental rights to J.L.

[31] Affirmed.

May, J., and Robb, J., concur.